GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
By:     BRANDON COWART
        JACOB M. BERGMAN
Assistant United States Attorneys
86 Chambers Street, 3rd Fl.
New York, NY 10007
Tel.: (212) 637-2693/2776
Email: brandon.cowart@usdoj.gov
        jacob.bergman@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

           Plaintiff,

           v.

METROPOLITAN RETINA ASSOCIATES,
P.C., and DR. KENNETH S. FELDER, M.D.,

           Defendants.

**COMPLAINT**

Case No. 18 CV 9146

---

The United States of America, by its attorney, Geoffrey S. Berman, United States Attorney for the Southern District of New York, alleges for its complaint-in-intervention as follows:

**PRELIMINARY STATEMENT**

1. This is a civil fraud action brought by the United States of America (the "United States" or the "Government") against Metropolitan Retina and Dr. Kenneth S. Felder ("Dr. Felder" and collectively, "Defendants") under the False Claims Act (the "FCA"), 31 U.S.C. §§ 3729-3733, to recover treble damages sustained by, and civil penalties owed to, the Government arising out of Defendants' submission of false and fraudulent claims for reimbursement to the

Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq*. ("Medicare"), and the New York State Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* ("Medicaid").

2. Metropolitan Retina is an ophthalmology practice owned and operated by Dr. Kenneth Felder. As set forth more fully below, from 2010 through 2017, Defendants engaged in two separate fraudulent schemes, each resulting in the submission of false and fraudulent claims for reimbursement from Medicare and Medicaid. In the first scheme, Defendants submitted claims for fluorescein angiography procedures that were of such poor quality, so as to be worthless. The images produced by these procedures were often out focus, contained no fluorescein dye, and/or failed to capture the appropriate portions of the eye. Sometimes, Defendants failed to capture any images at all in procedures billed to Medicare and Medicaid. In the second scheme, Defendants billed Medicare and Medicaid for ophthalmologic ultrasounds that were either not performed or not supported by any documentation in the relevant patients' medical files.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1331 and 1345.

4. Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and 1391(c) because Defendants transact business in this district.

## PARTIES

5. Plaintiff is the United States of America suing on its own behalf and on behalf of the United States Department of Health and Human Services ("HHS"), and its component agency, the Centers for Medicare and Medicaid Services ("CMS"), and is responsible for

overseeing the Medicare and Medicaid programs.

6.  Defendant Metropolitan Retina ("Metro Retina") is an ophthalmology practice located in Manhattan and Brooklyn.

7.  Defendant Dr. Kenneth Felder is a licensed and board certified ophthalmologist who is Metro Retina's sole owner and sole physician.

**FACTS**

**A. The Medicare Program**

8.  In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services.  Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease.  *See* 42 U.S.C. §§ 426, 426A.  HHS is responsible for the administration and supervision of the Medicare program.  CMS is an agency of HHS and is directly responsible for the administration of the Medicare program.

9.  Medicare has several parts, including Part A (which is primarily for hospital-based charges) and Part B (which is primarily for physician-based charges and other ancillary services).  Claims for Medicare Part B services are submitted on CMS form 1500.

**B. The Medicaid Program**

10.  Pursuant to the provisions of Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, the Medicaid program was established in 1965 as a joint federal and state program created to provide financial assistance to individuals with low income to enable them to receive medical care.  Under Medicaid, each state establishes its own eligibility standards, benefit packages, payment rates and program administration rules in accordance with certain federal statutory and regulatory requirements.  The state directly pays the health care providers for services rendered to Medicaid recipients, including physician-based services, with the state obtaining the federal share of the Medicaid payment from accounts which draw on the United

States Treasury.  *See* 42 C.F.R. §§ 430.0 *et al.*  The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average.  *See* 42 U.S.C. § 1396d(b).

11. Providers who participate in the Medicaid program, including both physicians and pharmacies, must sign enrollment agreements with their states that certify compliance with the state and federal Medicaid requirements.  Although there are variations among the states, the agreements require, in substance, that the Medicaid providers agree to comply with all state and federal laws and Medicaid regulations in connection with providing service or supplies to patients and billing the state Medicaid program for services or supplies furnished.

12. Furthermore, in many states, Medicaid providers, including both physicians and pharmacies, must affirmatively certify, as a condition of payment of the claims submitted for reimbursement by Medicaid, compliance with applicable federal and state laws and regulations.

13. In New York, physicians and pharmacies must periodically sign a "Certification Statement for Provider Billing Medicaid," in which the provider certifies that claims submitted "to the State's Medicaid fiscal agent, for services or supplies furnished," "will be subject to the following certification. . . . I (or the entity) have furnished or caused to be furnished the care, services, and supplies itemized and done so in accordance with applicable federal and state laws and regulations."

14. Health care providers must assure that all services for which they submit claims for Medicare and Medicaid payment are "of a quality which meets professionally recognized standards of health care." 42 U.S.C. § 1320c-5(A)(2).

15. Further, Medicare and Medicaid covers, and participating providers agree to submit, claims only for services that are medically necessary to diagnose and treat illness or

injury, and for which the provider maintains adequate supporting documentation corroborating the treatment administered and for which reimbursement is sought. 42 U.S.C. § 1395y(a)(1)(A).

### C. CPT Codes

16.     In order to receive reimbursement payments from the Government for medical services covered by Medicare and Medicaid, a provider must submit claims for payment containing Current Procedural Terminology ("CPT") codes.  These codes are a set of standardized medical codes developed and maintained by the American Medical Association. CPT codes are used to describe and report medical, surgical and diagnostic procedures and services to public and private health insurance programs for medical billing purposes.

17.     The United States uses CPT codes to determine both coverage, *i.e.*, if it will pay for the billed medical procedures and services, and reimbursement, *i.e.*, how much it will pay for the billed medical procedures and services.

18.     Each procedure or service or item furnished to a patient has a specific CPT code. Further, each CPT code receives a certain level of reimbursement, which may vary depending on what other codes are simultaneously submitted.  The amount of money a physician is paid by Medicare and/or Medicaid for a service rendered to a patient depends on which CPT codes are submitted as part of the corresponding claim.

19.     A treating physician must order reasonable and necessary services, appropriately document the justification and administration of these services, submit claims only for those codes that correlate with the notes made by the physician in the medical record, and adhere to coding guidelines when assigning applicable codes.  *See* 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.32(a)(2); 18 NYCRR § 540.7(a)(10).

20.     Further, for all CPT Codes, the procedure must be documented sufficiently by the physician or qualified non-physician practitioner in the patient's medical record to support any

claim submitted to Medicare and/or Medicaid for the service and/or procedure.  *See* Medicare Claims Processing Manual, Chap. 12 at § 30.6.1, Rev. 3873, 10-6-17; 18 NYCRR § 540.7(a)(10).

### D.  Fluorescein Angiography

21. Fluorescein angiography is an imaging test that highlights the blood circulation in the retina and choroid (the pigmented area between the retina and the white of the eye), and is used to aid in the diagnosis and treatment of retinal, choroidal and optic nerve disorders.  It is performed by injecting fluorescein into a vein, and taking a series of photographs of the eye fundus (*i.e.*, the interior surface of the eye) over time as the fluorescein flows through the blood vessels in the eye.  The dye leaks from damaged vessels, indicating the presence of certain ocular diseases such as macular edema.

22. Fundus images captured through fluorescein angiography are susceptible to image defects such as artifact errors.  Artifact errors distort the image of the fundus either by adding unwanted information or subtracting necessary information from the image.  Artifact errors in fundus images may arise from improper procedures such as incorrect camera-to-patient eye distance, incorrect alignment of the camera to the eye or retina camera malfunction.

23. Fluorescein angiography is billed under CPT code 92235.  To support a claim for fluorescein angiography, the procedure must produce an image that is free of defects and artifacts that strip all diagnostic value from the image and render it worthless.

### E.  Ultrasound Imaging

24. Ophthalmic ultrasound uses high-frequency sound waves to produce detailed two-dimensional, cross-sectional views of the eye and eye orbit.  This procedure may be used to diagnose a variety of ocular diseases, including, but not limited to: tumors, detachment of the retina, glaucoma, and cataracts.

25. Ophthalmic ultrasound is billed under CPT code 76512. To support a claim for ophthalmic ultrasounds, there must be a diagnostic ultrasound examination with permanently recorded images and measurements, when measurements are clinically indicated. *See* American Medical Association, *Current Procedural Terminology*, at 365 (4th Ed. 2010). In addition, a final written report, containing the physician's signature, must be included in the patient's medical record. *Id.*

### F. False Claims Act

26. The FCA establishes liability to the United States for any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," § 3729(a)(1)(B). "Knowingly" is defined to include actual knowledge, reckless disregard, and deliberate indifference. *Id*. § 3729(b). No proof of specific intent to defraud is required. *Id*.

### G. Defendants' Fraudulent Conduct

1. <u>Defendants Submitted False Claims for Fluorescein Angiography That Lacked Any Diagnostic Value</u>

27. Between, at least 2010 and 2017, Defendants performed thousands of Fluorescein Angiography procedures in which the resulting images contained artifacts or other defects that stripped the images of any diagnostic value. Defendants were prohibited from billing Medicare and Medicaid for such services.

28. Nevertheless, Defendants falsely billed Medicare and Medicaid for thousands of fluorescein angiography procedures that produced images that contained artifacts or other defects that removed any diagnostic or medical value from the procedures.

29. The vast majority of the images produced by Defendants through fluorescein angiography exhibited one or more significant defects that removed any diagnostic or medical value from the procedures, including, but not limited to: images that were out of focus; images in which little to no fluorescein dye was visible; images with no peripheral images; and/or negatives that captured no images. Neither Medicare nor Medicaid would have paid claims for such procedures had they known that the images produced by the fluorescein angiography procedures were so lacking in quality as to be essentially worthless.

30. For example, on April 2, 2012, Dr. Felder performed a fluorescein angiography on both eyes of Patient A and Defendants billed Medicare for this service. The images captured during this procedure were deficient because the images: were out of focus, failed to capture adequate views of the posterior pole (the portion of the retina between the optic disc and the macula); and contained no peripheral images. Accordingly, this fluorescein angiography had no diagnostic value. On April 6, 2012, Medicare paid $259.31 for this service. Medicare would not have paid this claim had it known that the fluorescein angiography testing provided by Dr. Felder was worthless and of no medical value.

31. Similarly, on April 13, 2010, Dr. Felder performed a fluorescein angiography on both eyes of Patient B and Defendants billed Medicare for the service. The images captured during this procedure were deficient because very little to no fluorescein dye appears in any of the retinal vessels and no peripheral images of either eye were taken. Accordingly, this fluorescein angiography had no diagnostic value. On October 26, 2011, Medicare paid $233.58 for this service. Medicare would not have paid this claim had it known that the fluorescein angiography testing provided by Dr. Felder was worthless and of no medical value.

32. Likewise, on February 10, 2012, Dr. Felder billed for a fluorescein angiography

performed on both eyes of Patient C and Defendants billed Medicare for the service. The images captured during this procedure were deficient because all of the images produced were out of focus and images of only one eye were captured despite the fact that Defendants billed Medicare for both eyes. Accordingly, this fluorescein angiography had no diagnostic value. On February 17, 2011, Medicare paid $259.31 for this service. Medicare would not have paid this claim had it known that the fluorescein angiography testing provided by Dr. Felder was worthless and of no medical value.

33. Further, on June 25, 2010, Dr. Felder performed a fluorescein angiography on both eyes of Patient D and Defendants billed Medicare for the service. The images captured during this procedure were deficient in the following ways: of the 26 film negatives, 8 are completely black; the remaining 18 images are out of focus, with only inferior blood vessels visible on most negatives. Accordingly, this fluorescein angiography had no diagnostic value. On July 15, 2010, Medicare paid $259.31 for this service. Medicare would not have paid this claim had it known that the fluorescein angiography testing provided by Dr. Felder was worthless and of no medical value.

34. Additionally, on June 8, 2012, Dr. Felder performed a fluorescein angiography on both eyes of Patient E and Defendants billed Medicaid for the service. The images captured during this procedure were deficient because no dye was injected into either eye and the images were out of focus. Accordingly, this fluorescein angiography had no diagnostic value. On July 9, 2012, Medicaid paid $13.00 for this service. Medicaid would not have paid this claim had it known that the fluorescein angiography testing provided by Dr. Felder was worthless and of no medical value.

35. Moreover, on November 12, 2012, Dr. Felder performed a fluorescein

angiography on both eyes of Patient F and Defendants billed Medicaid for the service.  The images captured during this procedure were deficient because very little to no dye was injected into either eye and no peripheral images were taken.  Accordingly, this fluorescein angiography had no diagnostic value.  On December 10, 2012, Medicaid paid $13.00 for this service.  Medicaid would not have paid this claim had it known that the fluorescein angiography testing provided by Dr. Felder was worthless and of no medical value.

> 2. Defendants Submitted False Claims for Ophthalmic Ultrasounds That Were Not Performed or Lacked Any Support in the Medical Records

36.     Between at least 2010 and 2017, Defendants billed Medicare and Medicaid for ophthalmic ultrasounds that were not performed or not supported by any documentation in the relevant patients' medical records.  Defendants are prohibited from billing Medicare and Medicaid for services that are not rendered or are unsupported by documentation corroborating the treatment administered and for which reimbursement is sought.

37.     Nevertheless, Defendants falsely billed Medicaid and Medicare for numerous ophthalmic ultrasounds that were either not performed or lacked any supporting documentation.  Had Medicare and/or Medicaid known that Defendants were not performing the ultrasound examinations or not supporting such examinations with adequate documentation, neither would have paid claims for such services.

38.     For example, on or about October 17, 2012, Defendants billed Medicare and Medicaid for an ophthalmic ultrasound that was purportedly performed on Patient G on October 16, 2012.  However, there are no records in Patient G's file supporting this procedure or corroborating that it ever occurred.  Medicare and Medicaid paid $86.24 and $4.00, respectively, for this service.  Neither Medicare nor Medicaid would have paid for this ophthalmic ultrasound had it known that it was either not performed at all and/or lacked any supporting documentation

10

in the patient file.

39.     Similarly, on or about June 12, 2012, Dr. Felder billed Medicare and Medicaid for an ophthalmic ultrasound that he claimed he performed on Patient H on June 8, 2012. However, there are no records in Patient H's file supporting this procedure or corroborating that it ever occurred.  Medicare and Medicaid paid $86.24 and $4.00, respectively, for this service. Neither Medicare nor Medicaid would have paid for this ophthalmic ultrasound had it known that it was either not performed at all and/or lacked any supporting documentation in the patient file.

40.     Further, on or about March 4, 2013, Dr. Felder billed Medicare and Medicaid for an ophthalmic ultrasound that he claimed he performed on Patient I on March 1, 2013. However, there are no records in Patient I's file supporting this procedure or corroborating that it ever occurred.  Medicare and Medicaid paid $89.17 and $4.00, respectively, for this service. Neither Medicare nor Medicaid would have paid for this ophthalmic ultrasound had it known that it was either not performed at all and/or lacked any supporting documentation in the patient file.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**Violation of the False Claims Act:  Presenting False Claims for Payment
(31 U.S.C. § 3729(a)(1)(A))**

41.     The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

42.     The Government seeks relief against Defendants under Section 3729(a)(1)(A) of the False Claims Act.

43.     By billing for fluorescein angiography procedures that were of such poor quality

so as to be worthless, Defendants knowingly caused false claims to be presented for reimbursement to Medicare and Medicaid, in violation of 31 U.S.C. § 3729(a)(1)(A).

44. By reason of these false or fraudulent claims that Defendants caused to be presented to Medicare and Medicaid, the United States has paid substantial Medicare and Medicaid reimbursements to Defendants, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## SECOND CLAIM

### Violation of the False Claims Act: Presenting False Claims for Payment
### (31 U.S.C. § 3729(a)(1)(A))

45. The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

46. The Government seeks relief against Defendants under Section 3729(a)(1)(A) of the False Claims Act.

47. By billing for ophthalmologic ultrasounds that were either not performed or not supported by any medical record documentation, Defendants knowingly caused false claims to be presented for reimbursement to Medicare and Medicaid, in violation of 31 U.S.C. § 3729(a)(1)(A)

48. By reason of these false or fraudulent claims that Defendants caused to be presented to Medicare and Medicaid, the United States has paid substantial Medicare and Medicaid reimbursements to Defendants, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## THIRD CLAIM

**Violation of the False Claims Act:  Use of False Statements**
**(31 U.S.C. § 3729(a)(1)(B))**

49.     The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

50.     The Government seeks relief against Defendants under Section 3729(a)(1)(B) of the False Claims Act.

51.     As a result of billing for fluorescein angiography procedures that were of such poor quality so as to be worthless, Defendants knowingly caused false records or statements to be made that were material to getting false or fraudulent claims paid by Medicare and Medicaid, in violation of 31 U.S.C. § 3729(a)(1)(B).

52.     By reason of these false or fraudulent records or statements that Defendants caused to made, the United States has paid substantial Medicare and Medicaid reimbursements to Defendants, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## FOURTH CLAIM

**Violation of the False Claims Act:  Use of False Statements**
**(31 U.S.C. § 3729(a)(1)(B))**

53.     The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

54.     The Government seeks relief against Defendants under Section 3729(a)(1)(B) of the False Claims Act.

55.     By billing for ophthalmologic ultrasounds that were either not performed or not supported by any medical record documentation, Defendants knowingly caused false records or

statements to be made that were material to getting false or fraudulent claims paid by Medicare and Medicaid in violation of 31 U.S.C. § 3729(a)(1)(B).

56. By reason of these false or fraudulent records or statements that Defendants caused to be made, the United States has paid substantial Medicare reimbursements to Defendants, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands judgment against Defendants as follows:

A. Treble the United States' damages, in an amount to be established at trial, plus a penalty for each false claim submitted or false record or statement made in violation of the False Claims Act;

B. Award of costs pursuant to 31 U.S.C. § 3792(a)(3); and

C. Such further relief as is proper.

Dated: New York, New York
October 5, 2018

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
Attorney for the United States


By: */s/ Jacob M. Bergman*
BRANDON COWART
JACOB M.BERGMAN
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, NY 10007
Telephone: (212) 637-2693/2776
Email: brandon.cowart.@usdoj.gov
jacob.bergman@usdoj.gov